KESSLER et al. v. ARMSTRONG CORK CO.

(Circuit Court of Appeals, Second Circuit. December 4, 1907.)

No. 3.

1. BILLS AND NOTES—FOREIGN EXCHANGE—WHAT LAW GOVERNS.

Where drafts were payable at Paris, the law of France determined what constituted payment.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 7, Bills and Notes, §§ 248–254.]

2. SAME—DRAFTS DRAWN IN SETS.

Where two sets of drafts, original and duplicate, were drawn by New York bankers on a bank in Paris, the duplicate to be paid only in case the original was unpaid, the two sets constituted in law but one draft, so that when the holder produced the duplicates duly protested, with notice of demand given, he made out a prima facie case, as no duty devolved on him to account for the originals, payment of which was a matter of affirmative defense.

3. JUDGMENT—FOREIGN JUDGMENTS—RES JUDICATA—MERITS.

The original of a set of drafts was indorsed by the payee when it was stolen, and paid under a forged indorsement of the name of the indorsee. The duplicate, having been similarly indorsed by the payee, was received by the indorsee, and, on payment being refused because of the payment of the original, suit was brought against the drawee by the indorsee, in which judgment was rendered against him on the ground that since his name was not on the original he had no standing to criticise the payment thereof, and that the payee was discharged by the law of France where the draft was payable by the payment of the originals, and that the claim was therefore dismissed "entirely," and "as in all respects inadmissible and ill founded." *Held*, that such judgment was not a mere dismissal on the ground that the indorsee had no standing alone, the second ground being treated as obiter, but that the decision should be considered as resting on both grounds, and was therefore a judgment on the merits.

4. SAME—FOREIGN JUDGMENT—CONCLUSIVENESS.

Where a judgment of the French court dismissing a suit by an indorsee of a bill of exchange against the drawee was on the merits, it was not subject to re-examination in a suit in the federal courts of the United States by the payee against the drawer, in the absence of proof of fraud or want of jurisdiction of the French court, or that France so treats the judgments of the courts of the United States, but plaintiff, if bound by such French judgment at all, was estopped to question its grounds either in law or fact.

5. COURTS—DECISIONS AS PRECEDENTS—LAWS OF FOREIGN COUNTRIES—PROOF.

A finding of the French law with reference to the conclusiveness of the judgments of American courts is not binding on different parties to another action involving the same question, it being necessary that the foreign law be proved in every case as a fact.

6. JUDGMENTS—FOREIGN JUDGMENTS—CONCLUSIVENESS—PARTIES.

The indorsee of a bill drawn on bankers in France sued them on a duplicate of the set, the original having been paid under a forged indorsement, in which action a judgment was rendered against the indorsee, whereupon the payee took up the duplicates from the indorsee and sued the drawers in the federal court of the United States, who pleaded payment of the originals in defense. *Held* that, since neither the drawers nor the payee were parties or privies to the French judgment, it was not conclusive against the payee that the payment of the original by the drawee was sufficient to discharge the bills.

7. SAME—FOREIGN JUDGMENT—FINDINGS—CONSTRUCTION—"ORDINARY COURSE OF BUSINESS."

In an action in France on a foreign bill by the indorsee against the drawee, the original of which the latter had paid under a forged indorsement, the court found that the drawee made such payment in the ordinary course of business over the counter, and without notice that the original bills had been lost, and without opposition or objection to such payments, and that there was no evidence that the payments were made in bad faith. *Held*, that the use of the phrase "paid in the ordinary course of business" construed with the balance of the finding merely meant that payment was made to the holder of the original drafts against their surrender at the drawee's bank on a business day, in banking hours, in the same way it usually paid drafts, and was insufficient to exclude an

inference of negligence in the drawees, arising from their failure to detect a variance in the indorsement which was forged.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 6, p. 5042.]

8. SAME—FOREIGN JUDGMENT—FOREIGN LAW—CONCLUSIVENESS.

A foreign judgment against an indorsee of a foreign bill of exchange, in an action against the drawee holding that the latter was discharged by a payment of the original under a forged indorsement, was not conclusive evidence of the law of France, as applied to the facts that the drawee was not negligent in paying the bill as to persons who were neither parties nor privies to such judgment.

9. BILLS AND NOTES—FOREIGN BILLS—FORGED INDORSEMENT—PAYMENT—NEGLIGENCE—FOREIGN LAW.

Evidence held to justify a finding that the failure of the drawee of a bill payable in France to observe that the chain of indorsement was broken by an indorsement which obviously did not correspond to the name called for in the prior indorsement, and which was in fact a forgery, was such negligence as to deprive the drawee under the French law of the protection of the French Code de Commerce, art. 145, providing that a party who pays a bill of exchange at maturity without receiving notice of opposition [objection] is presumed to be legally discharged.

Noyes, Circuit Judge, dissenting in part.

In Error to the Circuit Court of the United States for the Southern District of New York.

Guthrie, Cravath & Henderson (William D. Guthrie, E. C. Henderson, and Joseph P. Cotton, Jr., of counsel), for plaintiffs in error.

Noble, Jackson & Hubbard (Herbert Noble and Hartwell P. Heath, of counsel), for defendant in error.

Before COXE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge. Kessler & Co., bankers of New York City, drew two sets of drafts, original and duplicate, one only to be paid, to the order of the Armstrong Cork Company on a bank in Paris, and put the bank in funds to pay the same. The Cork Company sent the originals by mail, duly indorsed, to the order of Matas Hermanos, but the same were stolen, and presented to the drawee with a forged indorsement in the name of Mata Hermanos, omitting the final "s" in Matas, to the order of B. Lauriez. The drawee paid the person presenting the drafts, who was unknown to it, and who was not B. Lauriez. By another mail the Cork Company sent the duplicates to Matas Hermanos, and the same duly indorsed having been presented to the drawee on behalf of Hijos de G. Matas payment was refused on the ground that the originals had been paid.

By the law of France, when the drawer has put the drawee in funds the latter becomes the principal debtor, and may be sued directly by the holder. Accordingly, Hijos de G. Matas brought suit against the drawee in the Tribunal de Commerce of the Seine, a court of competent jurisdiction, in which it was so proceeded that the court on two grounds, viz., that Hijos de G. Matas, not being on the original drafts, had no standing to criticise the payment thereof, and on the further ground that the payee was discharged by the law of France by the payment of the originals, dismissed the claim "entirely," and "as in all respects inadmissible and ill founded." The Cork Company, payee of

the drafts, then took up the duplicates from Hijos de G. Matas, and brought the present suit against Kessler & Co., the drawers, who pleaded payment of the originals in defense. As the drafts were payable at Paris, the law of France determined what constituted payment.

At the trial each party moved for a direction, and the trial judge held that the French judgment, under the case of Hilton v. Guyot, 159 U. S. 113, 16 Sup. Ct. 139, 40 L. Ed. 95, was not conclusive; that the drawee was guilty of negligence in paying the originals without observing that the chain of indorsements was broken by omission of the final "s" from the word "Matas," and directed a verdict for the plaintiff, to which Kessler & Co., the defendants, duly excepted. The two sets of drafts are in law to be regarded as but one, and when the plaintiff produced the duplicates duly protested with notice of demand given, it made out a prima facie case. No duty lay upon it to account for the originals. If the originals had been paid, that fact was a defense to be affirmatively proved by the defendants. Downes v. Church, 13 Pet. 286, 10 L. Ed. 127. The defendants sought to prove payment by offering the French judgment in evidence, against which the plaintiff made various objections.

First it said that it was merely a dismissal on the ground that Hijos de G. Matas had no standing, and therefore that it was not a decision on the merits. We cannot agree to this, because the court expressly rested its judgment, not only on the ground that the plaintiffs had no standing, but likewise on the ground that the drawee had discharged its liability by payment of the originals, all the charges of negligence against it having been considered by the court. Because either ground would have been sufficient without the other, we do not think that one must be held to be obiter dictum. The Supreme Court, speaking by Brewer, J., of one of its earlier decisions which was rested, not simply on the contracts between the parties involved in the case which only had been discussed in the court below, but also on a statutory obligation which the court itself for the first time suggested, refused to consider the latter ground as obiter, saying:

"We are unable to yield our assent to these contentions. While the claim of the plaintiffs in that case was founded directly upon the contracts, yet, if there were a statutory duty to let them into the joint use of the bridge and its approaches, that was enough to sustain a decree in their favor, and the contracts might be regarded as simply relieving the court of the work of settling minor matters, such as method of use, compensation therefor, and matter of control. Indeed, the alleged invalidity of the contracts was rested largely on the scope of the statutes, and the duties to the government and the public imposed thereby on the railroad company. Of course, where there are two grounds, upon either of which the judgment of the trial court can be rested, and the appellate court sustains both, the ruling on neither is obiter, but each is the judgment of the court and of equal validity with the other. Whenever a question fairly arises in the course of a trial, and there is a distinct decision of that question, the ruling of the court in respect thereto can, in no just sense, be called mere dictum. Railroad Companies v. Schutte, 103 U. S. 118, 143, 26 L. Ed. 327, in which this court said: 'It cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter. Here, the precise question was properly presented, fully argued, and elaborately considered in the opinion. The decision on this question was as much a part of the judgment of the court as was that on any other of the several mat-

ters on which the case as a whole depended.'" Union Pacific R. Co. v. Mason City & Ft. D. R. Co., 199 U. S. 160, 165, 26 Sup. Ct. 19, 20, 50 L. Ed. 134.

The plaintiff further objected that the French judgment, even if on the merits, was prima facie proof only, and could be re-examined to the bottom, but this is not so in the absence of proof of want of jurisdiction, of fraud, or that France so treats the judgments of our courts. Gray, J., summed up the law in the Hilton Case at page 202 of 159 U. S., page 158, 16 Sup. Ct., 40 L. Ed. 95, as follows:

"In view of all the authorities upon the subject, and of the trend of judicial opinion in this country and in England, following the lead of Kent and Story, we are satisfied that where there has been opportunity for full and fair trial abroad before a court of competent jurisdiction conducting a trial upon regular proceeding after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal upon the mere assertion of the party that the judgment was erroneous in law or in fact."

Applying this to the case in hand, the plaintiff, if bound by the judgment at all, was prevented from questioning its correctness either in point of law or of fact. In the Hilton Case the defendant pleaded and offered to prove that the French courts treated the judgments of our courts as prima facie evidence only, and re-examined them to the bottom on the merits. The trial judge having excluded this proof, the Supreme Court reversed the judgment on the ground that if such a situation were proved, our courts would not be bound in comity to treat French judgments in any different way. But in the present case there was no offer to prove the French law on the subject of foreign judgments, it being apparently supposed that what had been said by the Supreme Court in the Hilton Case was sufficient evidence of it. But in that case not only was the French law not proved, but the judgment was reversed because such proof had been excluded. And even if the French law had been proved, a finding of it in that case would not be binding on the parties to any other action involving the same question, because foreign law must be proved in every case as a fact.

The plaintiffs finally objected that neither Kessler & Co. nor the Cork Company were privies to the French judgment. Of course, payment by the drawee, who is the principal debtor, would discharge all the other parties to the drafts secondarily liable. Such payment would be a defense to one sued as secondarily liable, like Kessler & Co. in this case, by a subsequent holder, like the Cork Company. But the defense cannot be proved by the judgment in favor of the drawee in the action between it and Hijos de G. Matas because neither Kessler & Co. nor the Cork Company were parties or privies to the judgment. There are a number of authorities to the contrary, as may be seen cited in 23 Cyc. 1266. Levi v. McCraney, Morris (Iowa) 124; Durham v. Giles, 52 Me. 206; Hackleman v. Harrison, 50 Ind. 156; Leslie v. Bonte, 130 Ill. 498, 22 N. E. 594, 6 L. R. A. 62. They proceed largely upon the

theory that it would be very unreasonable to expose the principal debt-or, after he had been discharged in a suit by one holder, to successive suits by all prior holders on the same grounds, which might result in different judgments in different actions. However, the law of the federal courts, which is binding upon us, is very clearly stated in Railroad Co. v. National Bank, 102 U. S. 14, 26 L. Ed. 61. In that case the railroad company had issued a note for $5,000 payable to its own order, and indorsed by Palmer & Co. as accommodation indorsers, which finally came, through Hutchinson & Ingersoll, into the hands of the bank as collateral security for a prior indebtedness of Hutchinson & Ingersoll. The bank sued Palmer & Co. in the Supreme Court of New York, where judgment was rendered in favor of the bank for $601, apparently an amount due from the railroad company to Hutchinson & Ingersoll. Subsequently, the bank brought suit in the Circuit Court of the United States against the railroad company, and recovered judgment for the full amount of the note less what it had recovered from Hutchinson & Ingersoll. The difference between these two judgments was due to the difference between the law of New York under Coddington v. Bay, 20 Johns. 637, 11 Am. Dec. 342, and of the federal courts under Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865, the former holding a pre-existing debt not to be a sufficient consideration to enable a holder to recover on a note not valid between the parties, whereas the latter regarded a pre-existing debt to be as effective a consideration as a new payment in excluding all equities of prior parties. Harlan, J., said:

"The first proposition of the plaintiff in error is that there has been a final determination by a court of competent jurisdiction between the same parties or their privies upon the same subject-matter as that here in controversy. This contention rests upon the judgment of the Supreme Court of New York, in the action instituted by the bank against Palmer & Company, as the indorsers of the note in suit. The judgment in the state court clearly constitutes no bar to the present action. Personal judgments bind only parties and their privies. The railroad company was not a party to the separate action against Palmer & Company, nor did it receive notice from the latter of the pendency of that suit. It was, therefore, in no manner affected by the judgment. Had the company received such notice in due time, it would, perhaps, although not technically a party to the record, have been estopped, at least as between it and its accommodation indorsers, from saying that the latter were not bound to pay the judgment, if obtained without fraud or collusion. Being, however, an entire stranger to the record, it had no opportunity or right in that proceeding to controvert the claim of the bank, to control the defense, to introduce or cross-examine witnesses, or to prosecute a writ of error to the judgment. If, in the action against Palmer & Company, the bank had obtained judgment for the full amount of the note, and, being unable to collect it, had sued the railroad company, the latter would not have been precluded by the judgment in that action. to which it was not a party, and of the pendency of which it had not been notified, from asserting any defense it might have against the note. This being so, it results that the company cannot plead the judgment in the state court as a bar to this action. An estoppel arising out of the judgment of a court of competent jurisdiction is equally conclusive upon all the parties to the action and their privies. It may not be invoked or repudiated at the pleasure of one of the parties, as his interest may happen to require. The liability of the makers and indorsers was not joint, but several, and therefore a judgment in an action against the indorsers, upon the contract of indorsement, could not bar a separate action by the bank against the maker—certainly not where the maker was without notice from the indorsers of the pendency of the action against him."

This brings us to the last question in the case, namely, what was the legal effect under the law of France of what the drawee did?

The parties have entered into an agreed statement of facts which contains, among other things, photographic copies of the drafts and the indorsements thereon; a statement that the drawee paid the drafts to an unknown person; that the indorsement "Mata Hermanos" was a forgery; that the drawee "made said payments in the ordinary course of business and over the counter and without notice that such original bills had been lost, and without opposition or objection to such payments; and there is no evidence that such payments were made in bad faith"; and a translation of the French judgment and of extracts from the French Code de Commerce referred to in said judgment. The defendants contend that the finding that the drafts had been "paid in the ordinary course of business" excludes any inference of negligence in the drawees. We cannot agree to this. The phrase must be read in connection with the rest of the agreed statement of facts. So read, it obviously means that the drawee paid the holder of the original drafts against their surrender at its bank on a business day, in banking hours, in the same way it usually paid drafts. The phrase should not be taken to deprive the other facts agreed upon of all significance; for example, that the indorsement of Mata Hermanos was obviously defective in omitting the letter "s," and that the person to whom the drafts were paid was unknown to the drawee.

The defendants further contend that even if the parties to this suit were not parties or privies to the French judgment, still it is conclusive evidence of the law of France applying to the facts of the case. They refer us to and quote from a number of cases, no one of which we think justifies the extreme position taken. The language used by the judges must be read in connection with the facts in each case. No foreign judgment was involved in Elmendorf v. Taylor, 10 Wheat. 152, 6 L. Ed. 289, Mutual Reserve Association v. Phelps, 190 U. S. 156, 23 Sup. Ct. 707, 47 L. Ed. 987, or Cahen v. Brewster, 203 U. S. 543, 27 Sup. Ct. 174, 51 L. Ed. 310. The opinions delivered simply laid down the rule that the courts of another state or nation must be supposed to know their own law, and that their law is to be found in their decisions. In Laing v. Rigney, 160 U. S. 531, 16 Sup. Ct. 366, 40 L. Ed. 525, a foreign judgment was involved, and the question was whether the court had jurisdiction of one of the parties to it. This depended upon whether by the practice of New Jersey it was necessary to serve a subpoena in the case of a supplemental bill. There was no statute nor any decision of the Supreme Court of the state on the subject, and the court had to determine the law either by adopting the action of the chancellor in entering the decree against the party in question, or by adopting the opinion of a New Jersey lawyer, who thought that, no subpoena having been served, there was no jurisdiction of him. The court adopted the law as declared by the chancellor. In Donglioni v. Crispin, L. R. 1 H. L. 314, the parties to the action were actual parties to the foreign judgment in question. In Messina v. Petrococchino, 4 P. C. App. 144, the foreign judgment was in rem binding upon all the world. In Dent v. Smith, 4 Queen's Bench, 464, the court said it had no concern with the correctness or incorrectness

of the judgment of a Russian consular court, the only question being whether the plaintiff had been thereby compelled to pay the money which he was seeking to recover as a loss under a policy of marine insurance. In Carr v. Francis Times & Company [1902] A. C. 176, a proclamation of the Sultan of Muscat authorized certain seizures within the territory of Muscat, and it was held to be a defense against the plaintiff's claim. None of these cases shows that the French judgment is to be regarded as more than evidence of the French law.

Article 145 of the Code de Commerce provides:

"A party who pays the bill of exchange at maturity, and without receiving notice of opposition (objection) to the payment, is presumed to be legally discharged."

If this presumption is a violent one, then, evidently, under the agreed statement of facts that the drawee did pay "without opposition or objection to such payments" it is discharged as principal debtor, and so are Kessler & Co. and all the others secondarily liable on the duplicate drafts. But the decisions of the Cour de Cassation and the opinions of legal writers cited by the parties and the opinions of the experts examined by them showed that this presumption is rebuttable, and that the person who pays such drafts without notice of opposition may be liable if guilty of negligence sufficient to overcome the presumption.

In the case of Pujol v. Jordaan & Cohen, Dalloz, 1896-2-80, the court, speaking of a forged indorsement whereby the drawee was deceived, said:

"Whereas, the falsification of the check, and the erasure of the words 'Ruffen & Sons' and their substitution by the words 'Elene Paviani' are scarcely apparent; whereas, there exists between the form and the color of the letters composing the words 'Elene Paviani' and the form and color of the other letters of indorsement no such characteristic or striking difference as it would have been inexcusable not to remark; that the imitation is, on the contrary, so perfect that it is very difficult, even after a careful examination, to perceive it; that Pujol was wrong in contending that Jordaan & Cohen failed in the exercise of prudence in not verifying the identity of Elene Paviani," etc.

In the case of Bank of France and Richter-Linder v. De la Roche, Dalloz, 1871-2-27, the court said, among other things:

"Whereas, by the terms of article No. 145 of the Code of Commerce, the drawee who pays a bill of exchange at maturity is presumed to be legally released; whereas, this presumption can only be overcome by proof of collusion, fraud, or gross negligence; but, whereas, in this case, the good faith of the bank is not contested, but it is admitted, on the contrary, that it took the usual precautions in assuring itself as to the residence of the holder of the order, and making him present the stamped envelope in which the order was sent to Paris; that the only fault charged to it was in not having noticed that the signature of the receipt did not conform to the name of Richter-Linder, given in the letter of transmittal; whereas, if the initial letter of the word 'Linder' in the signature placed at the bottom of the receipt resembled rather a 'P' than an 'L,' it is not correct to say that it differed in a noticeable manner from the same letter as written in the indorsement of the order, and of which it rather appeared to be the facsimile," etc.

M. Edmond Kelly, an expert examined by the defendants, testified:

"Q. The article of the Code of Commerce to which you refer, namely 145, provides merely that there will be a presumption of payment, will it not? A. If it is proved that gross negligence was incurred in the payment of the note, article 145 would not apply."

M. Goirand, writer, says at page 210 of his book, speaking of article 145:

"The drawee must, on presentation of the bill, examine it in order to convince himself that the holder is the rightful owner. He must verify the chain of indorsements and, if it be broken, refuse payment. In other words, he must examine if all the signatures of the indorsers follow each other regularly and correspond, and whether each indorsement is followed by the signature of the indorser whose name is mentioned in the preceding indorsement."

M. Le Sourd, an expert examined by the plaintiff, testified:

"Q. What are the usual precautions which the law imposes upon a banker in making payment of bills of exchange, having reference particularly to the apparent right of ownership in the person presenting the draft for payment and his identity? A. After looking at the draft itself and the date and the amount of the draft, he must look very carefully at the signature and at all the line of indorsements. If there is in the indorsements, or in the signatures, the slightest doubt, he must require from the person who presents the draft all the necessary explanation so as to be as sure as possible that the person to whom he pays has the right to cash the draft. * * *"

He went on to testify that in his opinion the bank had not been guilty of negligence in this case.

The French judgment being not conclusive, but only admissible to show that the drawee did take up the original drafts under the circumstances stated, and that the Tribunal de Commerce of the Seine was of opinion that it was not guilty of such negligence as would overcome the presumption created by article 145, the trial judge was left to determine upon all the facts whether by the law of France the drawee was guilty of such negligence. He could consider the decision in the French case as being the opinion of an inferior tribunal, and could give it such weight as he thought it was entitled to under the opinions of the Cour de Cassation which were cited. Doing this, he thought that the failure of the drawee to observe that the chain of indorsements was broken by an indorsement which obviously did not correspond to the name called for in the prior indorsement was such negligence as under the French law would deprive the drawee of the protection of article 145.

We discover no error in this, and the judgment is affirmed.

NOYES, Circuit Judge (dissenting). While unable to reach the same conclusion as the majority of the court, I agree with them in their preliminary propositions, which may be thus summarized: (1) As the drafts were payable in France, the law of that country determined what constituted payment. (2) The burden of showing that the original drafts were duly paid was upon the defendants. (3) The judgment of the French court was a judgment upon the merits of the case, standing upon two grounds. (4) The decision of the Supreme Court in Hilton v. Guyot, 159 U. S. 113, 16 Sup. Ct. 139, 40 L. Ed. 95, is inapplicable. (5) The French judgment does not constitute res adjudicata. And so in the same way as the majority of the court, I come to the same final question: What was the legal effect under the law of France of what the drawee—the French bank—did?

The majority reach the conclusion that, under the French law, the bank was negligent, and was not discharged by its payment of the

first of exchange. On the other hand, I think that the French judgment holding the bank discharged should be followed here. The authoritative evidence of the nonstatutory law of a country is the decisions of its courts. The construction given by the courts of a country to its statutes will be adopted in other countries. The decisions of foreign lower courts upon the identical facts will be followed here, unless they be shown to contravene the decisions of higher courts. These propositions are conservative. The authority for them may be found in the following illustrative cases: In Elmendorf v. Taylor, 10 Wheat. 159, 6 L. Ed. 289, decided in 1825, Chief Justice Marshall said:

> "This court has uniformly professed its disposition, in cases depending on the laws of a particular state, to adopt the construction which the courts of the state have given to those laws. This course is founded on the principle, supposed to be universally recognized, that the judicial department of every government, where such department exists, is the appropriate organ for construing the legislative acts of that government. Thus, no court in the universe, which professed to be governed by principle, would, we presume, undertake to say, that the courts of Great Britain, or of France, or of any other nation, had misunderstood their own statutes, and therefore erect itself into a tribunal which should correct such misunderstanding."

In Laing v. Rigney, 160 U. S. 543, 16 Sup. Ct. 368, 40 L. Ed. 525, where the question was as to the effect to be given by a New York court to a decision of a New Jersey court in a matter of New Jersey law, the Supreme Court said:

> "In the absence of any statutory direction on the subject, and of any reported decision of the Supreme Court of that state, we are justified in finding the law to be as declared in the very case in hand, where the chancellor of the Chancery Court of New Jersey has entered a final decree based upon an original bill, the process under which was served upon the defendant within the state, and upon a supplemental bill, a copy of which with a rule to plead was served upon the defendant without the state. So long as this decree stands, it must be deemed to express the law of the state."

In Carr v. Francis Times & Co. [1892] A. C. 180, the House of Lords said of a decision of the Sultan of Muscat:

> "He has authorized it and declared authoritatively that it was a perfectly lawful act according to the law of Muscat, and I am of the opinion that no English tribunal is capable of going behind that declaration and saying that the Sultan of Muscat was wrong in his exposition of his own law."

In Dent v. Smith, L. R. 4 Q. B. 446, Cockburn, C. J., said of a Russian judgment:

> "Then it is said that they applied the law erroneously. Again, I think we have not to deal with that. We are not to sit here as a court of appeal against any judgment pronounced by a court which must be taken to be one of competent jurisdiction in the administration of the Russian law, and, whatever was substituted, became for the time Russian law in respect of matters of maritime law. The proper tribunal to appeal to, if there was any ground for appeal, was to the court of St. Petersburg."

In Doglioni v. Crispin, L. R. 1 H. L. 314, Lord Cranworth distinguished between a case where the precise point upon the identical facts has been determined by a foreign court and a case where it is necessary to take the testimony of learned foreigners as to the law upon such point:

158 F.—48

"It does not always happen, as is the case here, that the claim of the party litigating in our courts has been actually raised and decided in the courts of the country of the domicile. It is, therefore, often matters of necessity that our courts should receive evidence from learned foreigners as to what the law of the domicile is. Such evidence is in general far from satisfactory, but it often happens that no better evidence can be obtained, and then the courts here must ascertain from conflicting testimony, as well as they can, what the law is on which they must act. But here we are left in no doubt. The title of the respondent has been fully adjudicated upon by the courts of his domicile after long and careful consideration, and by their decision we are bound."

And, showing the distinction between the use of a judgment as res adjudicata and as evidence, Lord Cranworth in the same case also said:

"The respondent is not insisting here on the Portuguese decision as a bar to the appellant's demand on the mere ground that it is res adjudicata, but on the ground that it is the decision of a court of exclusive jurisdiction—a decision which we are bound to receive without inquiry as to its conformity or nonconformity with the laws of the country where it was pronounced."

To the same effect are the words of Lord Lindley in Carr v. Francis Times & Co., supra:

"The Court of Appeal, from whose judgment I feel compelled to dissent, appear to have thought that, as at the time of seizure the destination of the cargo seized was Muscat, the seizure was unlawful under the law of Muscat, and that the defendants had failed to prove that the seizure had been subsequently legalized. This view of the finding of the Muscat court, and its approval by the Sultan, ignores its value as evidence of the law of Muscat. I agree with the Court of Appeal that there was no judgment in our sense of the word either inter partes or in rem."

It appears from the French judgment that the question presented to the court there as to whether the drawee was discharged by reason of its payment of the first of exchange was upon the identical facts shown upon the present record. The French court was a court of competent jurisdiction. However constituted, it was created by the French people for the determination of their differences. After a full hearing, the court rendered its judgment upon the merits of the case. It took into consideration article 145 of the French Code of Commerce, which provides as follows:

"The party who pays a bill of exchange at maturity, and not receiving notice of opposition (objection) to the payment, is presumed to be legally discharged."

The court then considered the evidence, and held that the bank had committed no fault in paying the first drafts and was therefore discharged, no opposition to the payment having been made. The parties accepted the decision as correctly stating the French law, for no appeal seems to have been taken. In my opinion this judgment of the French court, upon the identical facts now appearing, is authoritative evidence of the law of France upon the question here arising. The vital point there as here was whether in view of the provision of the Code the bank was negligent and, consequently, not discharged. In such a case the facts are all-important. A different decision upon different facts may not arise from any different construction of the law, but because the facts are different. After a careful examination of

the French cases cited by the plaintiff, it does not appear to me that the facts are so similar that in any of them the decision is necessarily contrary to that of the French court upon the present facts. Nor can I accept the opinion of the witness learned in the French law as superior to the judgment of the French court. In the language of Hayes, J., in Dent v. Smith, supra, "One would think that the exposition of a court is about the best evidence you can have of the law of a country." It follows, therefore, that under the French law the payment of the first of exchange was valid, and the defense of payment in the present action established.

It is proper to say, moreover, that I reach the same conclusion if I ignore the French judgment altogether. In other words, I think the facts shown upon this record are insufficient to overcome the presumption under article 145 of the French Code, that the bank, by reason of its payment, was discharged.

In the agreed statement of facts this appears:

"The Société Generale made said payments in the ordinary course of business, and over the counter, and without notice that said original bills had been lost, and without opposition or objection to such payments; and there is no evidence that said payments were made in bad faith."

This statement places the bank precisely within the provisions of the Code. It paid a bill of exchange at maturity, without receiving notice of objection to the payment. As we have seen, the Code provides that, under such conditions, a drawee "is presumed to be legally discharged."

The expert witnesses agree that negligence must be clearly shown to overcome the presumption in the bank's favor. The parties agree that the bank's payments were made over the counter in the ordinary course of business, without notice and without bad faith. In my opinion the record fails to affirmatively show negligence. Certainly it fails to show the gross negligence, which one of the experts says must be shown.

It is urged, however, that negligence must necessarily be found from the fact that the forged indorsements omit the letter "s" in the word "Matas." But this would not in itself indicate forgery. A forger would naturally copy the forged name correctly when it was before his eyes, and not make the same mistake twice. While, of course, the indorsements are forgeries, to my mind they bear more the appearance of corrected signatures. But it is said that the irregularity of the indorsements should have put the bank officials upon inquiry. Conceding this, there is nothing upon the record to show that they failed to make inquiries. The agreed statement is silent upon this subject. It cannot be assumed from the mere fact that the record fails to state that the officials did anything that they did nothing. No assumption can be made, one way or the other. The presumption under the Code is in favor of the bank. The fact, standing by itself, that the forged indorsements were irregular, does not in my opinion overcome that presumption. And I cannot read anything more by way either of omission or commission into the agreed statement.

For these reasons, I think that there was error in the judgment of the Circuit Court, and that it should be reversed.